FiLED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

2007 JAN -4 P 2: 17

RICHARD EUGENE SEARS

Plaintiff,

vs.

**CASE NO.:**

CARRIER CORPORATION and
UNITED TECHNOLOGIES CORP

$3:07-cv-5-\text{-}\text{-}.25$cruck4

c/o   Registered Agent
CT CORPORATION SYSTEM
1200 S. PINE ISLAND ROAD
PLANTATION FL 33324

Defendants
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL:
## INJUNCTIVE RELIEF SOUGHT

Plaintiff RICHARD EUGENE SEARS sues Defendants CARRIER

CORPORATION ("Carrier") and UNITED TECHNOLOGIES CORP ("UTC") Delaware

corporations, hereafter occasionally collectively referred to as "Defendant" and alleges:

## I. PRELIMINARY STATEMENT

1.     This action is brought pursuant to the Employee Retirement Income Security

Act ("ERISA") 29 U.S.C. §1001 *et seq* ., and particularly section 510 (29 U.S.C. Section

1140) ; it is also an action for breach of contract, for unpaid incentive sales compensation,

brought pursuant to Florida common and statutory law.

1

2.     Defendant Carrier was Plaintiff's employer for more than 28 years, beginning on October 24, 1977.  Defendant UTC funded and administered various ERISA plans of which Plaintiff is or was a beneficiary, at all times material.  Defendants Carrier and UTC are herein occasionally referred to collectively as the Defendants.

3.     Before terminating him on May 10, 2006, at age 52, Defendants took actions intended to interfere with, which did interfere with, Plaintiff's attainment of certain rights under various ERISA benefits plans, funded and administered by the Defendants.  As a result of those actions, Defendants unlawfully deprived Plaintiff of his right to receive full pension benefits beginning at age 55, requiring instead that he wait until age 62, when he will receive severely diminished pension benefits.

4.     In addition to these ERISA violations, the Defendants have breached their contractual agreement to pay Plaintiff various forms of compensation, including incentive compensation, as described, for example, in the written documents attached as **Exhibit A**, captioned "2003 Sales Incentive Plan," and "Carrier Sales and Distribution 2002 Incentive Plan – Position Plan Description."  Defendants are liable to Plaintiff for that compensation, including pre-judgment interest, and attorneys' fees, as a matter of Florida statutory and common law.

5.     Plaintiff's breach of contract claims are so related to his ERISA claims that they form part of the same case or controversy under Article III of the United States Constitution.

2

## II. JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's ERISA claims pursuant to 29 U.S.C. §1132(e)(1).

7.      This Court may exercise supplemented jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8.      The unlawful employment practices at issue were committed in Duval County, Florida, and the Defendants are subject to personal jurisdiction in this judicial district. Accordingly, venue is proper within the United States District Court for the Middle District of Florida. 28 U.S.C. §1391 and 29 U.S.C. §1132(e)(2).

## III. PARTIES

9.      Richard Eugene Sears, born on December 27, 1953, is a citizen of the United States and resides within this judicial district. He was 23 years old when his employment began with the Defendants, and he was 52 years old when terminated.

10.     At all times relevant to this action, Mr. Sears was a "participant" in the Defendants' retirement and savings plans, as defined by 29 U.S.C § 1002(7) ("ERISA plans").

11.     Mr. Sears  alleges statutory violations of ERISA (*i.e.*, violations pursuant to Section 510) and not violations of the terms of the employee benefit plans at issue. Specifically, Mr. Sears alleges herein that the Defendants unlawfully denied him various forms of compensation which he had earned, and thereafter terminated him, for the purpose

3

of interfering with rights to which he was otherwise entitled under provisions of the Defendants' ERISA plans, and/or rights which he otherwise may have become entitled to receive under those ERISA plans. Accordingly, Mr. Sears need not pursue the relief procedures of the Defendants' ERISA plans, because it would be futile to do so.

12.   Carrier has about 45,000 employees, and its revenues for 2005 were $12.5 billion.

13.   UTC has about 222,200 employees, and its revenues for 2005 were $43 billion.

14.   Carrier is the world's largest manufacturer and distributor of heating, ventilating and air conditioning (HVAC) systems, and a global leader in the commercial refrigeration and food service equipment industry. It also provides related controls for home comfort, business systems and services, and industrial and transportation applications, as well as aftermarket services and components for both the HVAC and refrigeration industries. Carrier is a subsidiary of United Technologies Corporation.

15.   Each Defendant is an employer engaged in an industry or activity affecting commerce within the meaning of 29 U.S.C. § 1002(5) and (12). Defendants are both the plan "sponsor," 29 U.S.C. §10002(5), and the plan "administrator," 29 U.S.C. § 1002(16)(B), of both the retirement and saving plan for employees of United Technologies Corporation. At all times relevant to this complaint, Defendants maintained a facility for the customary transaction of its business in Jacksonville, Florida.

4

## IV. FACTUAL ALLEGATIONS

### *The Rule of 100 Retirement Plan*

16.     Defendants have maintained and do maintain various employee benefit plans including, but not limited to, a retirement plan.  The retirement plan at issue is based upon a "Rule-of-100." The Rule of 100 provides full, unreduced, normal retirement benefits to a covered employee, beginning at age 55, if the covered employee has at least 100 points by the age of 55.

17.     The 100 points are calculated by adding the age of the employee at the time of retirement to the sum of the years of the covered employee's continuous service (including double points for certain years worked by Mr. Sears, to be determined at trial).

18.     This retirement plan is named "United Technologies Corporation Employee Retirement Plan," and it is an employee benefit plan within the meaning of 29 U.S.C. § 1002(4) and 29 U.S.C. §1140.

### *Defendants' Savings Plan*

19.     In addition to its retirement plan, the Defendants have maintained and do maintain a plan named "United Technologies Corporation Employee Saving Plan." This savings plan permits covered employees to contribute a portion of their pay, and the Defendants match 60 percent of the employee's contribution, up to a maximum of 6 percent of the employee's actual annual pay, including salary and incentive compensation.  The covered employee is entitled to the savings plan balance only upon retirement.

5

20.     The savings plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(4) and 29 U.S.C. §1140.

21.     During Plaintiff's more than 28 years of employment, he held the positions of Supervisor of Customer Service, Senior Product Engineer, Product Manager, Senior Product Manager, Sales Manager and  Account Executive of Sales.

22.     During Mr. Sears' employment, his performance was typically regarded by the Defendants as satisfactory or better.

## *Unlawful Termination Adversely Affected*
## *Plaintiff's Pension (Timing and Amount)*

23.     As of May 10, 2006, when Mr. Sears was terminated, he had over 28 years of credited services and was over  52 years of age. His age plus the sum of his years of credited service (including double points for certain years of his employment, to be determined prior to trial) totaled 94 at the time of his termination, for purpose of the Defendants' Rule-of-100 retirement plan.

24.     Had he not been terminated, Mr. Sears would have earned 96 points as of December 27, 2006 (age 53);  98 points as of December 27, 2007(age 54);  and 100 points as of December 27, 2008 (age 55).

25.     Had he not been unlawfully terminated on May 10, 2006, Mr. Sears would have been entitled to retire, with full pension benefits, at age 55, beginning in January 2009. He also would have had the option of continuing to work past age 55, which he had planned to do.

6

26.     Because of his unlawful termination, Mr. Sears will not be able to begin receiving retirement benefits until after he reaches age 62, after December 27, 2014.

27.     In addition to being deprived of *any* pension for the period from January 2009, until January 2015, the amount of pension Mr. Sears will ultimately receive, beginning in January 2015, will be significantly reduced, according to the terms of the pension plan, because his employment ended before he was eligible to begin receiving his full pension benefit, *i.e.*,because he was terminated before December 27, 2008. In addition, absent the Defendants' unlawful conduct, Mr. Sears would have been eligible for an early retirement (prior to reaching age 55) by virtue of the Defendants "bridging" his retirement, by allowing him extra "points" towards his age and/or years of service, so that he could retire before age 55, with 100 points under the Defendants' Rule of 100 retirement plan.

### *Breach of Contract Adversely*
### *Affected Plaintiff's Pension Amount*

28.     In addition to being deprived of his pension for several years, and having the eventual amount reduced due to his early termination, Mr. Sears' pension has also been diminished by additional unlawful action by the Defendants, namely, breaching their contractual agreement to pay him incentive compensation for several years prior to his termination.

29.     Incentive compensation typically constituted more than 40% of his annual salary, when it was paid according to the agreement between Mr. Sears and the Defendants. The incentive compensation was supposed to be determined and calculated according to a

7

written plan description, an example of which is attached hereto as Exhibit A.

30.    Prior to Plaintiff's termination, the Defendants began unlawfully withholding substantial portions of Mr. Sears' incentive compensation, substantially reducing his annual salary.

### *"High Five" Years of Earnings Adversely Affected*

31.    The Defendants' breach of contract, with regard to Plaintiff's incentive compensation, was intended to, and did interfere with Plaintiff's "high five" consecutive years of annual earnings, during his final 10 years of employment, which are used to calculate Plaintiff's pension amount.

### *Plaintiff's Objections; Defendants' Retaliation*

32.    Mr. Sears objected to James A. Bradshaw, his immediate supervisor, in February 2003, that his incentive compensation for 2002 had been substantially underpaid. Mr. Sears protested that the failure to pay him his full incentive compensation was going to adversely affect his pension.

33.    Mr. Bradshaw did not disagree with Plaintiff's calculations, but stated, "They're not going to pay you that."

34.    When Mr. Sears persisted, Mr. Bradshaw stated "I will talk to them about it."

35.    Mr. Sears continued to press Mr. Bradshaw, for an explanation of why he had not been paid the full amount of the incentive compensation he had earned in 2002. Mr. Bradshaw failed to give Mr. Sears any substantive response.

## *Customer Base is Reduced*

36.     The Defendants then began reducing the size of Mr. Sears' customer base, by reducing the geographical area that he served.  Although he was originally responsible for the entire State of Florida, Mr. Sears' territory was first reduced to only Orlando and Jacksonville, and, thereafter, to only Jacksonville, by the fourth quarter of 2003.

## *Retaliatory Termination Planned*

37.     In October 2003, a customer of Mr. Sears told him that "you'd better watch your back," explaining that Mr. Bradshaw had stated that he was planning to put Plaintiff on a performance plan, as a pretextual reason to terminate his employment.

38.     Mr. Sears  continued to make inquiries about the incentive compensation he was owed, which amounted to many tens of thousands of dollars.  The Defendants continued to fail to provide a substantive response to Plaintiff's inquiries about the money he was owed.

## *Pretextual Performance Plan: 2004*

39.     Thereafter, on or about April 6, 2004, Mr. Bradshaw placed Mr. Sears on a 60 day performance plan, even though Plaintiff was exceeding all of his goals with the Defendants.

40.     Mr. Sears exceeded the terms of his 60 day performance plan, and was thereafter terminated on May 10, 2006.

### *Unlawful Motive*

41.    The Defendants' breach of contract, with regard to Plaintiff's incentive compensation, was intended to, and did interfere with Plaintiff's ability to obtain maximum matching funds from the Defendants, as a participant in their savings plan.

42.    The Defendants' unlawful interference with Mr. Sears' incentive compensation has resulted in a substantial savings to the Defendants, amounting to several hundreds of thousands of dollars, in money that Defendants did not pay to Mr. Sears as incentive pay, or as part of his savings plan, plus money Defendants will not pay to Mr. Sears as part of his retirement pension.

43.    The Defendants' unlawful termination of Mr. Sears, effective May 10, 2006, was intended to, and did interfere with Plaintiff's ability to earn his full pension benefit, and to become entitled to begin receiving that pension at age 55, beginning in January 2009, or even sooner, by bridging his points.

44.    The Defendants' unlawful termination of Mr. Sears, effective May 10, 2006, has resulted in a substantial savings to the Defendants, amounting to several hundreds of thousands of dollars that Defendants will not have to pay at all to Mr. Sears as part of his retirement pension, from January 2009 until January 2015, and which will be paid to him in a substantially reduced amount, beginning in January 2015.

10

### *Mr. Sears' Termination*

45.     When Mr. Sears was terminated, he was meeting or exceeding his performance

goals.

46.     His immediate supervisor told him, on May 10, 2006, that he was being

terminated, but that his selection for termination was NOT due to his work performance, or

his conduct.

47.     Mr. Sears' termination was intended to, and did, interfere with his right to

receive his full pension, beginning in January 2009. His termination had the effect of causing

him to lose his pension completely, from January 2009 until January 2015; and to thereafter

receive a steeply diminished pension amount, thereby saving the Defendants several hundred

thousand dollars.

48.     Mr. Sears has retained undersigned counsel to represent him in this action and

is obligated to pay them a reasonable fee for their services.

### COUNT I
### Violation of Section 510 of ERISA

49.     Plaintiff re-alleges the foregoing allegations.

50.     The adverse actions taken by the Defendants violate Section 510 of ERISA

which provides, in pertinent part, "[i]t shall be unlawful for any person to discharge, fine,

suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising

any right to which he is entitled under the provisions of an employee benefit plan, this title,

section 3001 [29 U.S.C. § 1201], or the Welfare and Pension Plans Disclosure Act, or for the

11

purpose of interfering with the attainment of any right to which such participant may become

entitled under the plan" 29 U.S.C. §1140.

51.     As a result of Defendants' breach of ERISA Section 510, Plaintiff has been

damaged in an amount to be determined at trial.

**COUNT II**
**Breach of contract**

52.     The Defendants have breached their contractual obligation to pay Plaintiff the

full incentive compensation he has earned, and to make the savings plan contributions that

would have been made had Plaintiff been paid his full incentive compensation, for several

years prior to his termination.

53.     Plaintiff's receipt of his pension benefits will be greatly reduced, in an amount

to be determined at trial, because of the Defendants' breach of its obligation to pay Plaintiff

the full measure of his incentive compensation, during the last several years of his

employment.

54.     Defendants owe Plaintiff unpaid incentive compensation, plus the value of his

diminished pension benefits, plus the value of the unpaid contributions to Plaintiff's savings

plan, and other benefits related thereto, in an amount to be determined at trial, which

Defendants have wrongfully withheld, together with pre-judgment interest and attorneys'

fees.

55.     The unpaid incentive compensation, savings plan contributions, and diminished

pension benefits constitute "unpaid wages," for purposes of Florida Statutes § 448.08, so that

12

Plaintiff is entitled to recover his reasonable attorneys' fees.

**WHEREFORE**, Plaintiff demands the following relief under *each* Count, unless otherwise specified:

a.  (ERISA)   An order awarding plaintiff the unpaid incentive compensation to which he is entitled under his incentive compensation plan; his retirement plan; and his savings plan;

b.  (ERISA) A declaratory judgment that the Defendants' practices (refusing to pay incentive compensation earned by Plaintiff; under-funding Plaintiff's savings plan; intentionally diminishing the value of Plaintiff's retirement pension; and terminating Plaintiff for pretextual reasons, before he achieved 100 points), are unlawful and void;

c.  An award of pre-judgment interest and post judgment interest on all amounts awarded pursuant to plaintiff's claims;

d.  (ERISA) An award of Plaintiff's reasonable attorney's fees and costs, pursuant to 29 U.S.C.§ 1132(g).

e.  (Breach of Contract) Reasonable attorneys' fees and costs pursuant to § 448.08, Florida Statutes.

f.  (ERISA) An order requesting the immediate reinstatement of Mr. Sears to his former position, or, in the alternative, an order awarding front pay to Mr. Sears until such time as his losses are fully mitigated.

13

g.    An order awarding all lost back pay, incentive pay, stock awards, profit

sharing awards, and all other economic losses related to the unlawful

conduct complained of herein.

h.    For such further legal and equitable relief as the court deems just and

proper.

i.    Trial by jury on all issues so triable.

Respectfully submitted this 3rd day of January 2007.


FORTUNE LAW OFFICES

**SCOTT THOMAS FORTUNE**
Florida Bar No.:  342815
1807 North Third Street
Jacksonville Beach, Florida 32250
(904) 246-2125 Telephone
(904) 246-1551 Facsimile
SFortune@FortuneLegal.com

Trial Counsel for Plaintiff

14

# EXHIBIT A

**2003 SALES INCENTIVE PLAN**
**Carrier Sales and Distribution**
**("CARRIER")**

The 2003 Sales Incentive Plan (the "Plan") is designed to attract, motivate and reward eligible plan participants who contribute to the achievement of participating Carrier business unit goals and objectives.   Incentive payments are awarded to eligible Plan participants who perform at or above predetermined levels.

## EFFECTIVE DATES

The Plan is effective January 1, 2003 through December 31, 2003.

## COMPONENTS OF COMPENSATION

### Overview

The total cash and benefits compensation of Plan participants at 100% of business plan performance is targeted to be strongly competitive with industry competitors.  Individual draws or salaries and incentives may vary from targets to reflect current and historical job performance, regional differences, etc.

### Base Salary

Participants in the Plan will receive a base salary or a draw, reviewed periodically by management. Adjustments may be made based upon individual performance, market and business conditions.

### Benefits

Plan participants will be eligible for employee benefits sponsored by their employing entity in accordance with the benefit plan provisions.

### Incentive

Incentive awards are based upon annual performance and/or annual objectives that are aligned with the business plan of the unit and are payable up to the annual maximum identified for each position.  Measurement criteria are set forth in the Position Plan Description (PPD) included as part of this document.

## ELIGIBILITY

Participants for incentive consideration are defined in each PPD.  Except for layoff, retirement, death, or long-term disability, an otherwise eligible Plan participant's continued employment by a unit of Carrier or United Technologies Corporation on the date an incentive payment is to be made for each payment period is a condition precedent for earning and receiving a bonus payment.  See Employment Separation section for treatment of commission payments.

### New or Transferred Employees

Plan eligibility requirements for newly hired or transferred employees will vary based upon business unit and/or position assignment.  Eligibility may begin immediately upon hire or may require employment in an incentive eligible position for a period of time.   Eligibility requirements for new employees takes into consideration previous work experience, amount of incentive opportunity based upon individual versus organizational achievement, the position's learning curve and responsibilities, and special business conditions such as placement into emerging market situations.  The PPD will disclose the standard eligibility requirements for the specific position; exceptions may be made for unique situations.

Year-end incentive payments based upon annual company or group criteria will be prorated based on the number of full months in which the employee was eligible for participation in the plan.  For example:

|         |   |                                      |
|---------|---|--------------------------------------|
| 9 Months | = | 9 / 12 x annual calculated payment |
| 5 Months | = | 5 / 12 x annual calculated payment |

Payments received under more than one (1) position during the year will be considered as one (1) for the purpose of defining payment.  This means if an individual who held a position with quarterly advance payment frequency was overpaid in one (1) position, the overpayment will be subtracted from awards of the most current position.

2003 SALES INCENTIVE PLAN

### EMPLOYMENT SEPARATION

#### Bonus Eligible Employees

Continued employment by a unit of Carrier or United Technologies Corporation on the date a bonus payment is to be made is a condition precedent for earning and receiving the bonus payment. Consequently, except for layoff, retirement, death or long-term disability, an employee who separates for any reason (voluntarily or involuntarily) prior to the date that the bonus payments are to be made has not earned the payment and is ineligible to receive any award under the Plan as of his/her separation date.

#### Commission Eligible Employees

An employee that is participating in a 100% commission based compensation plan will be eligible to receive commissions on jobs that have shipped as of the employee's separation date. Commissions paid to the separated employee will include a 25% holdback for A/R, back charges, etc. A true-up of the holdback will be calculated in subsequent quarters, but not exceed one year from product ship date. The Company reserves the right to make all final decisions on commissions paid.

### ADMINISTRATION

#### Award Payments

Payments for incentive awards will be made by separate check after the end of the payment period and after all relevant financial information has been determined and approved.

If a position allows for quarterly advance payments, see the PPD for an explanation of the advance calculation. Quarterly advance payments must total at least $100.00 or the payment will be held for future periods until the $100.00 total is achieved, or until the year-end final payment period, whichever occurs first.

#### Overpayments

If at the end of the Plan year an overpayment of incentive occurs, the overpayment will be carried forward to the next plan year and reduce any subsequent incentive award, unless otherwise stated.

If an incentive eligible employee's employment with Carrier terminates (voluntarily or involuntarily) any unearned advances or other overpayments of incentive will be a debt owed to Carrier by the employee. Such overpayment will be deducted from final pay to the fullest extent permitted by law and Carrier reserves the legal right to recover such sum. Carrier also reserves the right to offset against final pay any losses incurred by the company as a result of the employee's misconduct.

#### Management Judgment and Discretionary Payments

Carrier, at its sole discretion, may interpret the terms and conditions of the Plan to award payments to otherwise ineligible employees for having achieved at least satisfactory performance. Carrier shall determine the amount of such payments and the date of such payments. Payments to any one individual, otherwise eligible or ineligible under this Plan, do not obligate the company to make any other award or payment to any other employee.

Incentive Awards are based upon annual objectives that are aligned with the business plan of the operating unit. On rare occasions the company may adjust annual business plan objectives up or down based upon significant changes in the market, material cost, pricing or other business conditions. Similarly, incentive plan targets may also be adjusted.

Carrier may withhold, reduce or adjust incentive payments for reasons including, but not limited to, omissions, errors, windfall jobs or failure to comply with company policy, such as submitting delinquent or inaccurate expense reports, accepting jobs without pricing or credit approval, contracting terms or other appropriate approval, failing to obtain appropriate approvals for government jobs, or conducting business with customers or other Carrier employees in an unethical manner. Awards may be reduced or eliminated if job performance is documented in an action plan to be unsatisfactory or improvement is needed.

Carrier reserves the right to alter, modify, amend or eliminate this plan at any time.

## 2003 SALES INCENTIVE PLAN

**APPROVALS**

- ☒　　Ed Dabrowski, Chief Financial Officer, CSD
- ☒　　Mary Jo Bertrand, Human Resources Director, CSD
- ☒　　Tony Guzzi, President CSD
- ☒　　Carrier Compensation Director

2003 SALES INCENTIVE PLAN
## Plan Definitions Attachment

### 5% Overhead for Regional Services

The 5% deduction from actual gross margin for regional services consists of the following items:

Warehousing and logistics
Order management
Inventory planning
Financial services

### Market EBIT

For purposes of calculating Market EBIT in the 2003 incentive plans, Market EBIT is defined as SALES LESS the following items:

Cost of sales
Concessions
Warranty
Freight and delivery
Warehousing
Inventory adjustments
Salaries, commissions, overtime, all fringe benefits (including scholar program)
Direct customer related costs (advertising, meetings, promotional items, training, etc.)
Travel and vehicle costs
Facility costs (repairs, maintenance, rent, utilities, telephone, taxes, etc)
Outside services (janitorial, waste removal)
Bad debts

### Holdbacks for Accounts Receivable over 90 days

Past due receivables are determined based on the last statement generated for the quarter.
Incentive calculations must use cumulative year data, and deduct only the corresponding incentive relating to all A/R over 90 days.

Certain credit balances over 90 days should be excluded from the calculation as the inclusion of such credits serves to dilute the deduction for otherwise valid receivables over 90 days past due.

### Bad Debt Deduction

The incentive on a sale associated with a customer's accounts receivable that is written off as a bad debt will be deducted in the incentive calculation of the corresponding sales person.

### Premium Product TOS Codes

Where premium products are referenced in the incentive Position Plan Descriptions, they are defined as the following product codes:

| Prod Cat | Description |
| --- | --- |
| 1309 | Cond Unit-12+ seer Puron |
| 1310 | Cond Unit-14+ seer Puron |
| 1311 | Cond Unit-14+ seer 2spd |
| 1312 | Cond Unit-13+ seer Puron |
| 1328 | Heat Pump-15+ seer Puron |

## 2003 SALES INCENTIVE PLAN

| 1329 | Heat Pump -12 seer Puron |
| 1331 | Heat Pump-13+ seer 2spd |
| 1334 | Heat Pump-13+ seer Puron |
| 1345 | Fan Coils - Puron 40FK's |
| 1354 | PAC RT H/P 1-5 ton Puron |
| 1355 | PAC RT 1.5-5 ton Puron |
| 1356 | PAC H/P 2-5 ton dual fue |
| 1418 | GASF All Flow 90 Var |
| 1443 | GASF Up Flow Horz 80 Var |
| 1444 | GASF Dn Flow Horz 80 Var |
| 1462 | GASF Mult 80 Var |
| 1463 | GASF Mult 80 Var Lo Nox |
| 1730 | Electronic Air Cleaners |
| 1731 | Mechanical Filters |
| 1740 | Humidifers |
| 1750 | Recovery Ventilators |
| 1760 | Comfort Zone |
| 1786 | Programable Tstat Std 52 |
| 1792 | Access Zoning Prod Tstat |
| 1793 | Access Air Treatment |
| 2309 | Cond Unit-12+ seer Puron |
| 2310 | Cond Unit-14+ seer Puron |
| 2311 | Cond Unit-14+ seer 2spd |
| 2312 | Cond Unit-13+ seer Puron |
| 2329 | Heat Pump -12 seer Puron |
| 2331 | Heat Pump-13+ seer 2spd |
| 2334 | Heat Pump-13+ seer Puron |
| 2354 | PAC RT H/P 1.5-5 ton Pur |
| 2355 | PAC RT 1.5-5 ton Puron |
| 2356 | PAC H/P 2-5 ton dual fue |
| 2418 | GASF All Flow 90 Var |
| 2436 | GASF All Flow 90 MFG |
| 2443 | GASF Up Flow Horz 80 Var |
| 2462 | GASF Mult 80 Var |
| 2463 | GASF Mult 80 Var Lo Nox |
| 2730 | Electronic Air Cleaners |
| 2731 | Mechanical Filters |
| 2740 | Humidifers |
| 2750 | Recovery Ventilators |
| 2760 | Zone Perfect |
| 2786 | Programable Tstat Std 52 |
| 2787 | Programable Tstat Std 52 |
| 2792 | Access Zoning Prod Tstat |
| 2793 | Access Air Treatment |
| 5347 | Fan Coil - Puron |
| 5730 | Electronic Air Cleaners |
| 5731 | Mechanical Filters |
| 5750 | Recovery Ventilators |
| 5789 | Access Zoning Non Damper |
| 5792 | Access Dampers Mfg |
| 5793 | Access Air Treatment |
| 5798 | Access Dampers Pur |
| 57 | Total count |

## CARRIER SALES AND DISTRIBUTION 2002 INCENTIVE PLAN - POSITION PLAN DESCRIPTION

BUSINESS UNIT:    CSD                                    PLAN ADMINISTRATOR: Ed Dabrowski

PLAN NAME:    Strategic Accounts/RNC Territory Manager          DEPARTMENT: Residential Sales

TMs focused on New Business Development
(Up to 3 positions maximum per Region)

**POSITION PURPOSE & KEY RESPONSIBILITIES:**
Increase Carrier's volume and market share profitably by implementing the company's various product, support and
contractor development programs within a geographic territory consisting of assigned contractors, dealers, builders, developers.

Sales Volume:  $2,500,000 to 4,000,000

| Annual Incentive Range of Opportunity | | Threshold | | Maximum |
|---|---|---|---|---|
| | | $1 | | $85,000 less draw RNC: $60,000 |

| Approximate % of Total Incentive @ Target | Unit of Measure | Formula: | | |
|---|---|---|---|---|
| 0 - 100% | Margin $ | Formula:  Payout is % of Margin on personal accounts less draw of 25% Base Salary. No duplication of accounts with other TMs. Carrier, Bryant, and Payne  Residential Products All High Tier Res. Products Commercial  Products Parts, Supplies on designated accts* *GM must approve account assignment; no duplication of sales accounts with Outside Parts reps. | | |

| 0 - 100% | Margin $ | Formula:  Payout is % of Margin on incremental business. | Level RNC | |
|---|---|---|---|---|
| | | Incremental Baseline Margin, select accounts | 5.00% | capped at $30,000 |
| | | Incremental Product Mix Margin, select accounts | 10.00% | capped at $30,000 |
| | | Baseline must be established from PY Margin for select accounts; Incremental Mix Margin will not double-count as Incremental Baseline and vice-versa. | | |

| | |
|---|---|
| Payment Frequency: | Quarterly, on cumulative basis to reflect YTD performance. |
| Sales are credited: | At invoicing. |
| Holdbacks: | GMS of assigned accounts receivable over 80 days. |
| Deductions: | Incentive previously paid on bad debt write-off. |
| Expenses: | All business and auto expenses will be handled per appropriate Carrier Sales and Distribution policies and must be approved by next level management. Management reserves the right to set limits on business expenses as deemed appropriate. |
| Margin Definition: | "Margin" is defined as 95% actual gross margin (i.e., includes 5% charge for overhead - see attached explanation of overhead categories). |
| Base Salary: | 25% of a base salary up to $75,000 and 100% of base over $75,000 is considered draw toward total incentive. |
| Draws in Excess of Incentive | Carry-over to following year per plan policy, except: Sales Trainees may have excess draw protected for a period of up to 18 months from graduation from Carrier's Sales Training Program. TM's newly assigned to an abandoned or new market for Carrier may be approved by CSD. HQ to retain their full draw plus receive 5% incentive rate in lieu of above rate, but not to exceed payment as if on full commission, for the first 6 months of such assignment; may be extended an additional 6 months maximum. |
| Parts and Supplies: | Parts and supplies calculations are subject to random audits. |
| Level Assignments: | Level assignments must be approved by CSD HQ. |